SO ORDERED.
SIGNED this 21st day of June, 2012

*Shelley D. Rucker*
Shelley D. Rucker
UNITED STATES BANKRUPTCY JUDGE

THIS ORDER HAS BEEN ENTERED ON THE DOCKET.
PLEASE SEE DOCKET FOR ENTRY DATE.

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

In re:

                                       No. 09-13154
                                       Chapter 11

TRINITY COMMUNICATIONS, LLC,

     Debtor;

**MEMORANDUM**

Kennedy Koontz & Farinash ("KKF") has filed a motion seeking a finding of contempt against Genesis Merchant Partners, L.P. ("Genesis") for failing to fund the administrative expenses owed to KKF and due under the Plan of Reorganization confirmed for Trinity Cable, LLC ("Reorganized Debtor")[1]. [Doc. No. 381]. KKF also filed a motion seeking a finding of

---

[1] Trinity Cable, LLC is the successor to the debtor, Trinity Communications, LLC ("Debtor").

1

criminal contempt against Gavin Watson. [Doc. No. 382]. The motions were heard on January 26, 2012, and the court set a show cause hearing to determine why Genesis and Watson should not be held in contempt for their representations made at the Confirmation Hearing. The court also required a showing of whether contempt was appropriate as a result of Genesis' involvement in the management of the Reorganized Debtor and whether that control was causing the Debtor not to pay the allowed administrative expenses. At the January 2012 hearing, KKF withdrew its request for a finding of criminal contempt against Mr. Watson, and it now proceeds only with its request for civil contempt.

The Court finds that Genesis is in contempt of the court's order directing the payment of the administrative expenses of the Debtor. Its ruling is based on the following findings of fact based on the record in the case, the evidence presented at the contempt hearing held on March 21, 2012 ("Contempt Hearing"), and the arguments of counsel. This memorandum constitutes the court's findings of fact and conclusions of law required by Fed. R. Bankr. P. 9014 and 7052.

This court has jurisdiction over the parties pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (L), and (O). In addition, the court retained jurisdiction "to hear and determine all controversies, suits and disputes that arise in connection with the interpretation, implementation, effectuation, Consummation (sic) or enforcement of this Plan" and "to make such Orders as are necessary and appropriate to carry out and implement the provisions of this Plan" pursuant to Article XIII of the Plan of Reorganization, proposed by Genesis dated June 9, 2011, and confirmed on September 13, 2011. [Doc. No. 247, Plan of Reorganization, Article XIII(b) and (g), p. 19 ("Plan")].

2

### I.    Background

**A.    The Plan**

The Reorganized Debtor "provides cable television, telephone and internet services in Marion County, Tennessee, including South Pittsburg, Richard City, Kimball, Jasper and Sequatchie." [Doc. No. 248, p. 5, Disclosure Statement]. It filed Chapter 11 in 2009, and after unsuccessful attempts to confirm a plan, it gave up. The case was on the brink of conversion to a Chapter 7 when its primary secured creditor, Genesis, stepped forward and proposed a plan of reorganization. The Plan provided that secured debt owed to Genesis and three affiliated limited liability companies - Sands Brothers Venture Capital II, LLC; Sands Brothers Venture Capital III, LLC and Sands Brothers Venture Capital IV, LLC (collectively defined as "Sands Brothers" in paragraph 1.54 of the Plan) - would be restructured. Genesis and Sands Brothers received from the Reorganized Debtor, in full satisfaction of their claims: (a) Senior Secured Notes in the aggregate principal amount of $2,000,000; (b) Junior Secured Notes in the aggregate principal of $2,000,000; and (c) 90% of the equity interest in the Reorganized Debtor.  Plan, ¶ 4.1.  The Senior Secured Notes accrue interest at 10%, payable in cash monthly with a maturity date of 36 months after the effective date, as defined in the Plan. They were secured by a first in priority security interest in all of the assets of the Reorganized Debtor. *Id.*  The Junior Secured Notes accrued interest at the rate of 12%. They were payable in kind through the issuance of additional Junior Secured Notes until the Senior Secured Notes were paid in full. The Junior Secured Notes were secured by a second in priority security interest in all of the assets of the Reorganized Debtor.  The principal payments on the Senior Secured Notes were to be made from Pre Tax Profit generated by the Reorganized Debtor's business operations. After the Senior Secured

3

Notes were paid, the Junior Secured Notes were to be paid from Pre Tax Profit, so long as the Reorganized Debtor maintained a retained earnings balance of at least $100,000. *Id.*

The Debtor also had a note and a guaranty from other parties referred to in the Plan as the M3X Note and the Condor guaranty. The Plan provided that any recoveries from those assets would first be applied to repay the Proponent and the Reorganized Debtor for legal and administrative costs incurred by the Class 1 Secured Lenders after the Debtor's bankruptcy filing. Any remaining proceeds were to be applied to the Notes. The term "Pre Tax Profits" was defined in the Plan. Plan, ¶ 1.50.

The version of the Plan originally proposed by Genesis provided:

> 2.1.1 **General Allowed Administrative Claims** Each holder of an Administrative Claim that is allowed under Section 503(b), except as otherwise set forth in this Plan, shall receive either (i) with respect to Administrative Claims that are or become Allowed Claims on or after the Effective Date, the amount of such holders [sic] Allowed Claim to be agreed upon by the Reorganized Debtor and the holder of the Administrative Claim both in amount and payment structure; or (ii) such other treatment agreed upon by the Proponent or the Reorganized Debtor and such holder; provided, however, that any such Administrative Claim representing a liability incurred in the ordinary course of business by the Debtor shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such liability and any agreements relating thereto. An Administrative Claim with respect to which an application has been properly filed pursuant to this Plan and to which to [sic] objection has been filed or an objection has been filed but overruled by the Court, shall become an Allowed Claim to the extent such claim is allowed by Final Order.
>
> 2.1.2. **Fee Claims of Professionals** Each Professional Person whose retention with respect to this Chapter 11 Case has been approved by the Bankruptcy Court or who holds or asserts, an Administrative Claim that is a Fee Claim shall be required to file with the Bankruptcy Court a final fee application within forty-five (45) days after the Effective Date and to serve notice thereof on all parties entitled to such notice pursuant to applicable Bankruptcy Rules and in accordance with any orders entered in this Chapter 11 case regarding the compensation of professionals. The unpaid fees of Debtor's counsel approved by the Court prior to the Effective Date shall be paid in full by the Debtor on or before the Effective Date. Payment of Court-approved compensation after the Effective Date shall be made promptly after the order approving such compensation becomes a Final Order.

4

Plan, ¶¶ 2.1.1 and 2.

The Plan also provided a lump sum payment of $175,000 to be paid on the Effective Date to unsecured creditors. Plan, ¶ 4.3.

As stated in the Plan, the means for funding the Plan were to come from the Reorganized Debtor's business operations. Plan, ¶ 6.1 The Plan also provided that "[f]unds for operations and for Plan payments may be provided by Genesis and /or Sands Brothers on secured or unsecured terms, but there is no obligation to do so." *Id.* The Disclosure Statement accompanying the Plan and prepared by Genesis contained projections prepared by Mr. Watson that showed the Reorganized Debtor anticipated having Pre Tax Profits of approximately $20,000 a month. *See* [Doc. No. 248-1, Ex. A to Disclosure Statement, p. 1]; [Doc. No. 354, Confirmation Hearing Transcript ("Confirmation Tr."), pp. 25-27 (Watson's testimony regarding projections provided in Ex. A to Disclosure Statement)].

The Plan also provided that:

On the Effective Date, Christopher Kelly, chief operating officer of Sands Brothers Asset Management, LLC, will become president and chief executive officer of the Reorganized Debtor. Mr. Kelly will be involved in the Reorganized Debtor's operations, including strategic planning, expansion and marketing.

At the same time, Mr. Kelly will become a director of the Reorganized Debtor. The other directors, if any, will be appointed by the Class 1 claimants [Genesis and Sands Brothers].

Plan, ¶ 6.4. Following the effective date, Genesis and Sands Brothers would not only own 90% of the Reorganized Debtor but also their employees would be the officers of the Reorganized Debtor and control the board. Mr. Gee, the former owner of the Debtor, was to serve as the interim chief operating officer of the Reorganized Debtor for six months. *Id.*

5

### B. The Confirmation Hearing

The confirmation hearing was conducted on August 23, 2011 ("Confirmation Hearing"). Two creditors filed objections to the Plan. The Internal Revenue Service ("IRS") objected to the categorization of its claim. [Doc. No. 287 ]. Momentum Telecom, Inc. ("Momentum") objected on the bases of feasibility under 11 U.S.C § 1129(11) and the failure of the Plan to provide for the payment of Allowed Administrative Expenses on the Effective Date as required by 11 U.S.C. § 1129(a)(9). [Doc. No. 290].

At that hearing, the IRS announced a settlement of its objection which included the payment of its claim. Momentum argued its objection, and the court overruled the objection based on the existence of an ongoing dispute with Momentum regarding the amount of its claim and Genesis' offer to escrow the previously allowed amount to insure the claim's payment. The court found that the allowed claim was in dispute as a result of a counterclaim asserted by the Debtor and Genesis against Momentum that might offset the previously allowed claim. The court determined that this position effectively resulted in a reconsideration of the claim by the Reorganized Debtor.

Mr. Watson testified at the Confirmation Hearing as the representative of Genesis. Payment of the administrative expenses was an issue since the Plan did not provide a date certain for their payment and the Debtor did not have sufficient cash on hand to pay projected administrative expenses that would be due on the effective date. Mr. Watson testified that Genesis would pay all amounts that were necessary to be paid on the effective date under the Plan. Confirmation Tr., p. 27, lines 7-15; p. 28 lines 3-22; [Doc. No. 248-1, Ex. A, p.1].

Feasibility was also an issue for the Debtor given its past problems and the low cash balance at the time of the Confirmation Hearing. Its monthly operating report for July 2011

showed an ending month bank balance of $16,099.50. [Doc. No. 286, Monthly Operating Report for July 2011, Attachment 2, Question 3, Bank Accounts]. The report showed Net Income of $10,152.87 for the month, which included compensation and benefits of $28,713.61 and Professional Fees of $4,215.57. The year to date totals were $72,874 for income, $220,580.89 for compensation and $171,716.14 for professional fees.

At the Confirmation Hearing Mr. Watson's testimony was Genesis' proof on the issues of feasibility and payment of administrative expenses. He had prepared the projections that were attached to the Disclosure Statement. Confirmation Tr., p. 25, line 21; [Doc. No. 248-1, Ex. A, p.1]. Those projections showed a Pre Tax profit of almost $20,000 a month. He testified that the profitability would be the result of expense reductions, including lowering executive compensation and no longer needing to pay attorneys and accountants "post reorganization." Genesis' attorney Mr. Gossett also asked him about the payment of administrative expenses that would need to be paid on the effective date. Mr. Watson testified that Genesis would provide those funds. Confirmation Tr., p. 27, line 13; [Doc. No. 248-1, Ex. A, p.1].

The court, still concerned about the feasibility of the case, inquired further about Genesis' contribution to the Reorganized Debtor's operations. As part of their distributions under the Plan, Genesis and Sands Brothers received a lien on all of the property of the Reorganized Debtor. This property included a significant amount of equipment that had been contributed to the Debtor by the owner Jim Gee during the course of the case. That equipment had significant value and was not subject to the prepetition security interests of Genesis and Sands Brothers. If the Plan were confirmed and the blanket liens granted as provided in the Plan, there would be no unencumbered assets for any creditor that was not paid. During closing argument, the court asked what Genesis was contributing in exchange for this new blanket lien. Counsel for Genesis

7

estimated that Genesis was contributing almost $500,000 and itemized what was included in that number. The specific number stated was "$452,285". Confirmation Tr., p. 42. The itemization of that amount was reflected in the spreadsheet offered at the Contempt Hearing and included the agreed payments to the IRS and the estimate of the Debtor's professional fees. *Id.*; Trial Ex. 5, Spreadsheet entitled Trinity Communication Outstanding Issues.

      **C.**      **Basis for Genesis' Contribution**

At the Contempt Hearing, Genesis' counsel testified that the numbers he used came from spreadsheets he received from Mr. Watson. Mr. Watson testified that either he or his assistant prepared the spreadsheets. Emails were produced showing the evolution of the contents of these spreadsheets entitled "Trinity Communications Outstanding Issues." Trial Ex. 5. The list of items under the heading "Effective Date Payments" grew from three to five items. In the last spreadsheet prepared before the confirmation hearing, the total under "Effective Date Payments" matched the number Mr. Gossett used in court at the Confirmation Hearing. Trial Exhibit 2, Spreadsheet attached to August 18 Email; Trial Ex. 5, Spreadsheet attached to August 18 Email; [Doc. No. 354, Confirmation Tr. p. 43]; [Doc. No. 354, Confirmation Hearing Statements of Richard Gossett at p. 43]. Mr. Watson's testimony at the Confirmation Hearing was that Genesis "intend[s] to do what it takes to get past the confirmation of, of this plan. If that includes that action [of paying Momentum's administrative claim], I believe we intend to do that." Confirmation Tr., p. 28, Testimony of Gavin Watson.

Mr. Watson was in the courtroom during the Confirmation Hearing when Mr. Gossett made the representations regarding the amount of money Genesis was willing to pay to ensure that the Debtor could meet its confirmation obligations. At that time, he never corrected the representation that Genesis was willing to pay $452,285 to ensure the confirmation of the Plan

and to obtain a security interest in all of the Reorganized Debtor's assets. *See* [Doc. No. 442-2, Richard B. Gossett Deposition with Exhibits filed as Exhibit to Show Cause Hearing, p. 52 ("Spreadsheet")]. Mr. Watson testified at the Contempt Hearing that he should have corrected Mr. Gossett because he did not understand the meaning of administrative expenses. He claimed that he thought they were court costs. The court does not find Mr. Watson's explanation credible. There was no line item for court costs on the Spreadsheet. Mr. Watson was in charge of preparing the list of outstanding issues and acted as the client representative in discussions with Mr. Gossett. While he testified that this case was his first bankruptcy experience, he also testified that this was not his first transaction. The section of the Spreadsheet itemizing the attorneys' fees was not headed by the term *administrative expense*. It used the phrase "Effective Date Payments." Trial Ex. 5. That is the same phrase that Mr. Gossett used when he questioned Mr. Watson about what Genesis was committed to pay. The professional fees designated as "Klingler Fees" and the IRS claim were included in the list on the Spreadsheet entitled "Effective Date Payments." Further, at the Confirmation Hearing, when the Assistant United States Attorney asked about the IRS administrative claim which was also listed on the Spreadsheet, Mr. Watson testified Genesis would fund that expense. Confirmation Tr., p. 30, Testimony of Gavin Watson.

At Mr. Watson's deposition, which was offered as Trial Exhibit 1 by KKF at the Contempt Hearing, Mr. Watson stated that Genesis did not intend to pay KKF on August 24, 2011, the date of the Confirmation Hearing. *See* [Doc. No. 442-1, pp. 23; 38-39].

**D.    Genesis' Knowledge of the Fee Issue**

Mr. Gossett testified that he had discussions with Mr. Watson, Mr. Sands, and Mr. Kelly about the need to pay administrative expenses in order to obtain confirmation. He believed that Genesis would pay those expenses listed on the Spreadsheet. [Doc. No. 442-2, Deposition of

9

Richard B. Gossett ("Gossett Dep."), pp. 36- 41]. On August 31, 2011, he sent an email in which he discussed claims and the "need to update the spreadsheet as to the amounts that must be paid or put into escrow on the effective date" to Chris Kelly, Gavin Watson, S.B. Sands, M. Sands and Rose Tsai, Mr. Stephen Sand's assistant. Trial Ex. 10.

Mr. Watson, Mr. Sands and Mr. Kelly deny they ever had such a discussion with Mr. Gossett. *See* Testimony of Gavin Watson, Contempt Hearing ("Watson Test."), March 21, 2012 at 4:36 – 4:37, 4:43-4:44 p.m.; Testimony of Stephen Sands, Contempt Hearing ("Sands Test."), March 21, 2012 at 3:50, 3:54 p.m.; Testimony of Christopher Kelly, Contempt Hearing ("Kelly Test."), March 21, 2012 at 4:25-4:26 p.m. The court does not find these denials credible. Mr. Watson worked with Mr. Gossett by telephone and email and exchanged the spreadsheets. Chris Kelly, inhouse counsel for Genesis, worked with Mr. Gossett to draft the plan and disclosure statement which included an estimate for the Debtor's attorney fees. Mr. Kelly signed these documents on behalf of Genesis. Mr. Kelley testified that he was aware that "there were various expenses and fees associated with the bankruptcy and that they had to be dealt with." Kelly Test., March 21, 2012 at 4:26 p.m. On August 31, 2011, he instructed Mr. Gossett to work with Mr. Watson on payments to various claimants/creditors in response to Mr. Gossett's email regarding the filing of the confirmation order with the court. Trial Ex. 11.

Like Mr. Kelly, Mr. Sands also received notice of the fees. Mr. Sands' name or his assistant's name appears as a party copied on the August 31 email from Mr. Gossett regarding filing the Confirmation Order and the need to update the spreadsheet regarding the amounts that had to be paid or escrowed. Trial Ex. 10. Mr. Sands' assistant also received the October 31, 2011 email from Mr. Gossett raising the issue of the inquiry by Mr. Klingler regarding his fees. Trial Ex. 13. However, at the Contempt Hearing Mr. Sands testified that he did not remember any

10

discussion about fees or Genesis' commitment to pay them as a requirement for confirmation. Sands Test., March 21, 2012 at 3:55 – 3:56 p.m.

### E.     Failure to Disclose Genesis' Intention Not to Pay the Fees

The confirmation order was not entered until September 13, 2011, almost three weeks after the Confirmation Hearing. [Doc. No. 318 ("Confirmation Order")]. During this period, the parties negotiated the amendments that had been offered and approved at the Confirmation Hearing to resolve the objections. The order included amendments to the Plan discussed at the Confirmation Hearing and incorporated the settlement between the Reorganized Debtor and the IRS.  It set up Momentum's escrow account, and it contained a revised provision regarding the requirement of payment of administrative claims on the effective date of confirmation or, if not allowed until after the effective date, as soon as practicable. [Doc. No. 318]. The new provision also provided a second alternative that an allowed administrative claim could be paid as agreed upon by "the Proponent [Genesis] or the Reorganized Debtor and such holder." [Doc. No. 318, Order, ¶ 4.c.]. The initial proposal by Genesis had provided that payment of, as well as the amount and structure would be by agreement with no deadline for the payment of administrative expenses allowed after the effective date. *See* [Doc. No. 247, ¶ 2.1.1]. However, both versions contained a separate paragraph for the payment of professional fees that required "prompt" payment by the Debtor after allowance.  Plan ¶ 2.1.2. The Confirmation Order was prepared, not by the Reorganized Debtor, but by Genesis and signed by its attorney. *See* [Doc. No. 318].

During the three weeks between the Confirmation Hearing and the entry of the Confirmation Order, Mr. Watson never corrected his counsel's understanding of Genesis' commitment. Gossett Dep., pp. 36-37. The parties moved forward to set an effective date, pay the lump sum to the unsecured creditors, escrow the money, execute Genesis' and the Sands

11

Brothers security agreements and notes, and even transfer all of the assets of Trinity Communications, LLC into a newly formed entity Trinity Cable, LLC. This successor to the Debtor has assumed all of the Debtor's obligations under the Plan. As for the other remaining administrative claims shown on the spreadsheet except for the claim of KKF, they were paid or negotiated with those creditors. Mr. Watson testified they had negotiated with the IRS regarding its administrative claim. Watson Test., March 21, 2012 at 4:40 p.m. Mr. Fulton, who represented Genesis at the Contempt Hearing, indicated that those negotiations had resulted in no amount being owed to the IRS.

### F.     KKF Compliance with the Plan

KKF has complied with the terms of the Plan for administrative creditors. It has obtained court approval to be paid an administrative expense of $76,101.17. [Doc. Nos. 319, 331]. KKF has made demand on Genesis and the Reorganized Debtor, but has received no payment. *See* [Doc. No. 381, Motion for Contempt].

Mr. Sands and Mr. Kelly now claim they were never informed of the post confirmation filing of KKF's fee application or the fact that the court granted the application without objection and ordered the Debtor to make the payment. The docket reflects that Mr. Gossett was served with the fee application. [Doc. No. 319]. The contention regarding the entry of the order awarding the fees is contradicted by an email from Mr. Gossett sent to Mr. Kelly with the court's order. Trial Ex. 12.

### G.     Lack of Effort to Comply

No evidence was offered that Genesis has provided any working capital or supported the Reorganized Debtor by paying any additional funds other than the escrow for Momentum and the unsecured creditor payment since confirmation. Following confirmation, Mr. Watson sent the

Reorganized Debtor a memorandum of starting balances which contained a notation for a balance owed for an "Attorney Payable – Jim Gee". It directs payments to be made "$2,000 a month as available." [Contempt Hearing, March 21, 2012, Ex. 15]. Mr. Hunter, the general manager of the Reorganized Debtor, testified that he received and used those balances. The balance used for KKF is $76,101.17. *Id.* The payment terms are contradictory to the Plan terms for payment of the professional fees and this court's order directing the payment of the fees. The court also notes that Mr. Watson's memorandum has the Reorganized Debtor paying Genesis' legal bills to its law firm Baker Donelson on a $2000 a month schedule, even though the Plan provides that those expenses would be paid from recoveries from the Condor guaranty and the M3X Note. Trial Ex. 15; Plan¶ 4.1.

Since the effective date, the Reorganized Debtor has paid Genesis nothing on the secured claims. Mr. Hunter testified that, on the day of his deposition, he had $3,000 on hand. Testimony of Jim Hunter, Contempt Hearing ("Hunter Test."), March 21, 2012 at 3:39 p.m. Mr. Hunter testified that there was no money available for the Reorganized Debtor to pay the claim of KKF. Hunter Test., March 21, 2012 at 3:39 p.m. No financial information, other than Mr. Hunter's testimony, was offered as evidence of the Reorganized Debtor's ability to pay. Further, there was no evidence offered to demonstrate whether Genesis made the expense reductions described by Mr. Watson at the Confirmation Hearing. At the time of the Contempt Hearing, the Reorganized Debtor had filed no quarterly reports. On April 24, 2012, almost a month after the Contempt Hearing, the operating reports were filed which reflected $61,677 in net income before interest, taxes, and depreciation for the quarter ending 12/31/11 and $35,813 in net income for the quarter ending 3/31/12. [Doc. Nos. 457, 458].

13

## II.     Analysis

"In a contempt proceeding, 'the basic proposition [is] that all orders and judgments of courts must be complied with promptly.'" *Gnesys, Inc. v. Greene*, 437 F.3d 482, 493 (6th Cir. 2005) (quoting *NLRB v. Cincinnati Bronze, Inc.,* 829 F.2d 585, 590 (6th Cir. 1987)). In order to ensure the enforcement of those orders, the bankruptcy court has civil contempt powers under 11 U.S.C. § 105. "[C]ivil contempt may be either intended to coerce future compliance with a court's order, or to compensate for the injuries resulting from the noncompliance." *Gnesys*, 437 F.3d at 493 (quoting *Glover v. Johnson*, 199 F.3d 310, 313 (6th Cir. 1999)). "Once willful contempt of court is established, the Court may compel compliance and compensate the complainant." *Williamson v. Recovery Ltd. Partnership,* Nos. 09-4253, 09-4255, 2012 WL 171385, at *8 (6th Cir. Jan. 20, 2012)(citing *Electrical Workers Pension Trust Fund of Local Union No. 58, IBEW v. Gary's Electrical Service Co.*, 340 F.3d 373, 385 (6th Cir. 2003)).

The movant has the burden of proving that an act of contempt has occurred in a civil contempt proceeding. *Gnesys*, 437 F.3d at 493 (quoting *Glover*, 934 F.2d at 707). The movant must show by clear and convincing evidence that the contemnor violated an order of the court. *Gnesys*, 437 F.3d at 493. To prove that violation, he must show that there was a violation of a specific and unambiguous order by a party to whom that order applied. *Grace v. Center for Auto Safety,* 72 F.3d 1236, 1241 (6th Cir. 1996). "Ambiguities must be resolved in favor of the party charged with contempt." *Williamson*, 2012 WL 171385 at *9 (citing *Grace*, 72 F.3d at 1241).

Based on the foregoing findings of fact, the court concludes that KKF has carried its burden of showing that an act of contempt has occurred. There was an order – the Order Modifying and Confirming the Plan signed by Genesis' counsel that contained the provision for the payment of administrative claims. That provision included both the Debtor and the Proponent

as parties who would be involved in the negotiation of the payment of those claims. This order was entered in reliance on Genesis' representations about its commitment to ensure that the Reorganized Debtor could perform its confirmation obligations.

In addition to the Confirmation Order, there is an order requiring the Debtor to pay the fees. The court finds that the Reorganized Debtor has no independent management other than Genesis. The Reorganized Debtor has been paying other ongoing expenses since confirmation; however, Genesis' memorandum to Mr. Hunter regarding "what . . . money was owed to everybody" and "what the monthly budget would look like" directed the Reorganized Debtor to pay the attorney balance in monthly installments over approximately three years "as available." The court finds this memorandum to be evidence that Genesis exercised its control to cause the Reorganized Debtor to violate its obligations under the Plan and the order granting KKF's fee application. Watson Test., March 21, 2012 at 4:42 p.m.

This court has the power to find contempt pursuant to Federal Rule of Civil Procedure 71, as made applicable to bankruptcy adversary proceedings by Federal Rule of Bankruptcy Procedure 7071 and contested matters by Federal Rule of Bankruptcy Procedure 9014. The court may also find non-parties in contempt where those parties have actual knowledge of the court order and abet the party in violating the court's order of confirmation and the order allowing and authorizing the payment of the fees. *Stotler and Company v. Able*, 870 F.2d 1158, 1164 (7th Cir. 1989). Genesis has not shown that (a) this Debtor was not able to make any payments toward the KKF administrative claim or (b) it has made every attempt to cut those costs that would allow the Debtor to meet its Plan obligations and meet the very projections it prepared in support of the Plan's feasibility.

Even if the Debtor has not had sufficient income to make the payment in full, the court finds that Genesis has failed to provide the $452,285 its counsel represented it would be contributing to the Debtor's operations to ensure confirmation and justify its security interest. Had those funds been made available, the Debtor could have performed.

Genesis' first defense is that this commitment to pay the allowed professional fee claim was a big misunderstanding -- Genesis never intended to pay anything but the escrow amount to Momentum and the payment to unsecured creditors. It argues that its representative did not know what he was talking about when he testified in court that Genesis would pay what was needed on the effective date of confirmation. The court does not find that the Plan was confirmed based on a big misunderstanding. The court specifically asked what Genesis was contributing for its lien. Although the Plan states that Genesis was under no obligation to make further advances, Genesis, aware of the Debtor's inadequate funds, stepped up and represented to the court and the parties in attendance at the Confirmation Hearing that it was going to provide a specific amount that would cover the expenses needed to obtain confirmation. That amount included the payment of administrative claims, including the allowed legal fees of the Debtor's professionals.

Genesis' conduct both before and after the hearing also leads the court to believe that the statements at the Confirmation Hearing were not mistakes. Genesis included an estimate of the fees in the Disclosure Statement. Mr. Watson included the amount in the Spreadsheet in the same category as the expenses that Genesis did pay. After the Confirmation Hearing, neither Genesis nor Mr. Watson made any effort to correct the mistake in the three weeks before the Confirmation Order was entered. As the author of the plan, Genesis put KKF and all administrative creditors on a tight deadline to file their applications. When that application was filed, it did not object or raise the issue that the Debtor would not have enough funds to pay the

16

administrative claims. As the party controlling the Reorganized Debtor, Genesis could have objected to the fees. Mr. Gossett sent notice of the filing of the application, and no action was taken. He sent the order approving the fees. Genesis failed to file a motion to reconsider or appeal. Having failed to raise the issue at the appropriate time or to negotiate terms it would have found acceptable, Genesis sent a memorandum to the Reorganized Debtor directing a different payment schedule rather than the one contained in the Plan and this court's order. The same memorandum also directed the Reorganized Debtor to pay Genesis' bills in a manner contrary to the terms of the Plan.

Genesis' second defense is based on the language in the Plan which makes its funding obligations optional. Since those obligations are optional, it argues, it has not violated the court's order. It seeks to rely on the binding effect of the Confirmation Order. Genesis' argument would be more persuasive if its representative had relied on that Plan language at the Confirmation Hearing rather than testifying that Genesis would pay all expenses needed at the effective date to obtain confirmation. Its position would also be more plausible if its representative had corrected his counsel's statements about the amount Genesis was actually prepared to pay to obtain confirmation and its first lien position. Having made those representations to obtain the benefits of the Confirmation Order, Genesis may not disregard them now. The court will not allow Genesis to rely on a different interpretation of its funding obligations than what it represented to the court to obtain the Confirmation Order.

### III.   Conclusion

Having obtained the benefits of the confirmed Plan, Genesis has acted in contempt of the Confirmation Order and has caused the Debtor to fail to comply with the court's order authorizing payment of the administrative expense claim of KKF. Genesis may purge itself of

this contempt by the payment of $76,101.17, which is an amount equal to the outstanding balance of previously approved professional fees for KKF, to KKF on or before 14 days after the entry of the order accompanying this memorandum. If the balance is not timely paid, KKF may file a statement of the fees expended with the court within 28 days of the entry of this memorandum. Genesis will have 14 days after filing to respond or object. The court will review the statement and any response and consider an award of an amount necessary to compensate KKF for its expenses, including attorneys' fees, in pursuing the motion for contempt. If those amounts are not paid, the court will also award an additional fine of $285 a day, payable to KKF. The court recognizes that Sands Brothers and Genesis may view the fine amount as unusual, but the court selected an amount that will compensate KKF at the rate of one billable hour of Mr. Klingler's time a day should continued collection in this matter be necessary after this court's ruling. The court is not imposing any separate sanction on Mr. Watson. The court finds that Mr. Watson's actions were taken solely in his representative capacity for Genesis.

      A separate order will enter.

# # #